GENERAL ELECTRIC CO. v. CHICAGO FUSE WIRE & MFG. CO.

(Circuit Court, S. D. New York. February 14, 1910.)

PATENTS (§ 328*)—INFRINGEMENT—ELECTRIC SAFETY FUSE.

The Thalacker patent, No. 502,511, for an electric safety fuse consisting of a main safety fuse, an auxiliary safety fuse, and a box or casing completely enveloping the main fuse, but so constructed as to permit the condition of the auxiliary fuse to be seen, is valid and entitled to a reasonably broad construction, and is infringed by a construction in which the "condition" of the auxiliary fuse may be seen, although the fuse itself cannot.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Suit by the General Electric Company against the Chicago Fuse Wire & Manufacturing Company. On motion for preliminary injunction. Motion granted.

W. K. Richardson (A. D. Salinger, of counsel), for complainant.
V. S. Allyn, for defendant.

RAY, District Judge. The validity of claims 1, 2, and 4 of the so-called "Thalacker patent," No. 502,541, dated August 1, 1833, for electric safety fuse, have been adjudicated by the Circuit Court of Appeals in the First Circuit, opinion by Lowell, J., no dissent, handed down November 12, 1909, in General Electric Company v. Fred B. Smith, 173 Fed. 790. I am of the opinion, after considering the prior art, consisting of a large number of prior patents submitted on this motion, the affidavits in support of and in opposition to this motion, and the opinion of the court in the case referred to, that such claims of the said patent are valid. They read as follows:

"1. In an electric safety fuse, the combination of a main safety fuse, an auxiliary safety fuse, and a box or casing completely enveloping the main fuse, but so constructed as to permit the condition of the auxiliary fuse to be seen.

"2. In an electric safety fuse, the combination of a main fuse, an auxiliary fuse, and a casing completely enveloping the main fuse, but only partially enveloping the auxiliary fuse."

"4. In an electric safety fuse, the combination of a main fuse, an auxiliary fuse, overlying and underlying portions of insulating material, and an inclosing casing, said casing provided with an opening through its top portion whereby the condition of the auxiliary fuse may be observed."

In an electric safety fuse, the combination of a main safety fuse with an auxiliary fuse, or auxiliary safety fuse, and a box or casing completely enveloping the main fuse, but so constructed as to permit the auxiliary fuse to protrude therefrom itself, or by means of a connection so as to give notice of unusual diturbance by ringing a bell attached to or connected therewith, was old. The result was that, if the main fuse blew or fused, the auxiliary fuse followed suit, and warning was given by the ringing of the bell. It was desirable to have a construction where, while the main fuse was completely covered and hidden, the "condition" of the "auxiliary fuse" might "be seen," or "observed." It is obvious that the alarm or notice given by the ringing of a bell would be a temporary notice and might or might not be heard. The ringing would not be continuous. Once rung, the notice is of no further use, while, if the condition of the auxiliary fuse may be seen or observed at all times, the box or casing of the main fuse need not be disturbed. The purpose of the invention of the patent in suit was to permit, not the auxiliary fuse itself, to be seen or observed, but the "condition" of such auxiliary fuse, to "be seen" or "observed" at all times; the main fuse and auxiliary fuse being incased by a box or casing. It is not denied that it is desirable and necessary to safety that the main fuse be incased. When the main fuse is "blown," the auxiliary fuse is blown also by the excessive current which undertakes to pass through it, as the current can no longer use the main fuse. When the main fuse is blown, there is danger; an arc may be formed, etc. The utility of an auxiliary fuse or wire need not be gone into.

By leaving a small opening in the box or casing and leaving a small part of the auxiliary fuse exposed to sight, its condition at all times can be seen and the condition of the main fuse known; that is, correctly inferred. The great purpose to be served is to completely hide or pack the main fuse and the greater portion of the auxiliary fuse, but, in some way, to enable its "condition" to be seen, and to provide means whereby these results shall be obtained.

In the case referred to (General Electric Company v. Smith), the auxiliary fuse or a connecting wire was carried into or through a small quantity of paste contained in or at a small opening in the box or casing, and when the main fuse blew the current was carried into the small wire, and the heat generated by the resistance burned or colored the paste and as a result the "condition" of the auxiliary fuse was "seen" or "observed," and that of the main fuse known. No part of the auxiliary fuse or wire was actually "seen." But its "condition" was seen, observed, made known, by the burned or discolored condition of the paste. That is, the actual condition of the auxiliary fuse in that construction is made known to the eye by the action of light transmitted from the burned or discolored surface in contact with and burned or discolored by the blowing out of such auxiliary fuse. We see, not the fuse, but its "condition," by the evidence it gives or condition it produces in that substance which is connected to or with it as a part thereof. This was held an infringement for the reason that the "condition" was seen.

I am of opinion the claims in issue are entitled to a construction broad enough to cover the device of the paste construction. If narrowed to a construction where the auxiliary fuse or the wire substitute must be actually seen, infringement would be easy, and the value of the patent destroyed. The claims in issue use no language requiring or compelling such a narrow construction. The condition of the auxiliary fuse is seen, known, made manifest, by the condition of the fuse or wire itself, if actually exposed, or by that of the paste or other material immediately surrounding that part of the wire or fuse not hidden by the box or casing, when that part is covered by paste or some other material. The language of the claims, evidently, was carefully selected with a view to prevent infringements such as have been mentioned. The language of the specifications is somewhat narrower. They say, after describing the prior art and the objections to be overcome:

"In other constructions the fusible strips have been inclosed in a suitable tube or box, which arrangement obviated the objections stated, but was not suitable for use, as the condition of the fuse could not easily be observed. In order to make a safety fuse which shall have none of the faults mentioned. I combine with a strip of fusible metal, completely inclosed in a nonconducting box or case, an auxiliary fusible strip so located and connected as to be seen at all times, and which will be destroyed when the main fuse, which is out of sight, is 'blown.'"

After describing the main fuse, box, etc., he says:

"10 and 10a are thin strips of wood, vulcanite, indurated paper or similar material: one of which is placed over and the other under the main fusible strip, 5, so as to, in connection with the main strip, completely fill the cavity of the inclosing case. Arranged over the portion, 10, is what I term the auxiliary fusible strip, 11, which may be made of any suitable material which

will fuse at the same temperature as the main strip, or be fused when the main strip is fused; a thin sheet of tin foil I find answers the purpose as well as anything else. A part of this strip, it will be observed, lies under and across the opening, 9, in the upper portion, 8, of the case, and can be seen plainly through the opening. * * * The operation of my improved fuse is readily understood. When the main fuse is blown, the auxiliary fuse is likewise blown; the main fuse. however, being completely incased within the protecting cover, the material of which it is made cannot scatter, nor can an arc be formed, and the action of the fuse is no longer affected by variation in temperature. At the same time, the condition of the main fuse will always be indicated by the condition of the auxiliary fuse as seen through the opening in the casing."

It is quite clear that Thalacker had in mind an opening in the tube, case, or box containing both the main and the auxiliary fuse with some portion of the auxiliary fuse exposed to view through that opening; but it is evident that he had in mind the possibility and probability that this part of the auxiliary fuse might be covered or hidden from actual view or sight by some covering. and that this would be immaterial so long as the "condition" of the auxiliary fuse could be observed or seen. Hence he claims a construction where the "condition," not the auxiliary fuse itself, may be seen. I think a strip of paper or other material connected with the auxiliary fuse so as to be acted upon by it is to be considered a part thereof.

The alleged infringing device, "Complainant's Exhibit, Broadhurst Exhibit, Defendant's Fuse," and "Complainant's Exhibit, Broadhurst Exhibit, Defendant's Exhibit cut open," show the case, the main fuse, and the auxili ·y fuse, consisting of a small wire which passes through a small aperture in the case and at a little distance re-enters the case. The exposed portion or end of this wire or auxiliary fuse is covered with a paper, and when the main fuse is blown the excess current is carried to the surface, and this paper covering is burned or discolored, and thus the "condition" of the auxiliary fuse is "seen" or "observed" or known, and the condition of the main fuse is also necessarily disclosed.

I am of the opinion that infringement is not avoided by bringing the auxiliary fuse or wire to the surface of the casing and covering it with a thin paper, or with wax or with material of any kind, which on the passage of an abnormal current which blows the main fuse so acts upon the auxiliary as to cause it to make its condition and that of the main fuse known by burning or discoloring the covering. This covering in this construction is in fact made a part of the auxiliary fuse and makes its condition "seen" by the eye. And it is immaterial that the auxiliary is not a fuse strictly speaking. It carries current and by its resistance generates heat and burns or discolors the attached paper, or wax, or whatever is used as a covering, and thus indicates to the eye the blown condition of both the auxiliary and the main safety fuse. This is not an improved construction, but merely a changed construction, which in one sense avoids the specific wording of the specifications of the patent in suit, but not its spirit or true meaning. While Thalacker was not a pioneer in the art, he was a. pioneer in the sense that he was first to present an electric safety fuse of this particular type, and is entitled to a reasonably broad construction. It was unnecessary

to say that, if the auxiliary fuse was brought to the surface of the casing and covered with a paper so as to show itself and exhibit its condition to the eye there, it was within his claim, or that, if so brought to the surface and connected with a paste or paper so as to exhibit its true condition to the eye through that medium, it was still, as so located and connected, within his invention and claims. In short, it was not necessary to state that mere changes of constructions were included.

It is unnecessary to say that changes of form or construction which produce no new or material change in mode of operation or practical results will not avoid infringement. As the Circuit Court of Appeals, First Circuit, has sustained the patent in suit and held a substantially similar structure to be an infringement, I am constrained to grant the motion for a preliminary injunction.

So ordered.